IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DENNIS GARBUTT,

        Petitioner,                    No. CIV S-05-2130 GEB KJM P

    vs.

D.K. SISTO,[1]

        Respondent.              FINDINGS AND RECOMMENDATIONS

                             /

        Petitioner is a state prison inmate proceeding pro se with a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging his 2004 denial of parole. He alleges that the action by the Board of Prison Terms (BPT or Board) violated his plea bargain and violates due process.

I. <u>Background</u>

        On September 18, 1984, petitioner was sentenced to a total term of twenty-seven-years-to-life following his guilty plea to first degree murder and his admission that he used a firearm during the commission of the crime. Answer, Ex. 1. Although neither party has provided a copy of any written plea agreement or of the transcript of the guilty plea, the probation

---

[1] At respondent's suggestion, this court substitutes D.K. Sisto, the warden of CSP-Solano, for Tom Carey as respondent.

1

report and the transcript of the sentencing hearing suggest that, in exchange for petitioner's plea, the prosecutor dismissed a robbery charge and its enhancements and the special circumstance allegation, which would have subjected petitioner to a term of life without the possibility of parole.  Answer, Ex. 3; Petition (Pet.), Ex. B at 1 & Ex. D at 3.

At the hearing, the panel summarized the facts of the crime:

> [T]his crime occurred on February 22nd of 1984 and this is when you and your partner, Billy Morgan and others, discussed committing a robbery.  And so you went to a factory parking lot . . . and . . . came upon the victim in this case, a Mr. Peter Short, who was 39 years of age, who was going to his vehicle.  And you accosted the victim, at which time you were in possession of a shotgun.  And the victim allegedly grabbed the gun that was being held by you and it was fought over and the gun went off and the victim was hit and fatally wounded.  You and your companion left in your companion's vehicle and Billy Morgan took the victim's car and briefcase.  And then on February 23rd, the following day, police officers on patrol responded to a radio call concerning car strippers . . . .  And upon their arrival, they saw two black males run away from a '79 Toyota.  Another black male and the prisoner were noted to be in the front passenger section of the vehicle and appeared to be attempting to remove the radio from the dash.  Officers ran the vehicle license and received information that the vehicle had been taken in a robbery/murder the previous day and the officers detained you on the indicated charge and your companion, Billy Morgan, was arrested the following day on the same charges.

Pet., Ex. A at 10-11.  Commissioner Daly asked petitioner if that was "a true reflection of what happened that night" and petitioner agreed that it was.  Pet., Ex. A at 11.  However, immediately thereafter, petitioner told the panel there was no preconceived plan to commit a robbery, but rather they were just driving around aimlessly when the idea occurred to one of his crime partners.  Pet., Ex. A at 12.   He also denied he was attempting the strip the car the next day, explaining instead that he told his crime partners to "stay out of the man's car.  Just walk away from all this and forget about it."  Pet., Ex. A at 15.

/////

/////

1    A representative of the Los Angeles County District Attorney's Office was present

2 at the parole hearing to oppose parole.  He told the panel:

> Despite his statements today that he knew nothing about what was going on, the facts indicate otherwise.  One of his companions by the name of Kevin Goodman gave a statement to the police in which he told the police that they had been driving down several blocks, the initial intent being to get high on marijuana.  They didn't have any money.  There were five of them, including the inmate.  Two of them were brothers, Chris, one of the defendants, and his brother, Cornell.  Mr. Goodman gave a statement to the police in which he heard Chris's brother, Cornell say, man, I don't want any part of that.  When he asked him what he was talking about, he said, don't you hear what the[y] . . . are talking about.  He was talking about Billy and Dennis.  I said, what are you talking about and Billy said, he and Dennis were talking about making some money.  I asked how they were going to do that, sell the marijuana?  And Billy said, they were talking about jacking somebody.  The statement then goes on to indicate how the robbery went down, in which the inmate was implicated as holding the shotgun and firing the shotgun and the victim falling to the ground.  In terms of what the activity that took place after, the next day, the police reports indicate that [o]fficers . . . got a radio call of car strippers. . . . Upon their arrival, the officers . . . observed two male Negroes run westbound from a 1979 Toyota. . . .He also observed another male Negro in the front passenger section of the vehicle. . . . At this time, the male Negro, later identified as Dennis Garbutt, looked up from the front seat where he had been attempting to remove the radio. . . . Detectives brought him to Newton station where . . .[h]e stated initially that he was with Chris and Billy and they had a shotgun in Chris's car with them.  He said they were looking for someone to rob. . . . They saw the victim walking to his Toyota.  The rest of the statement, he blames the actual shooting on Billy. . . . He said that Chris took the hood and the battery from the car and he was taking the radio, meaning himself, when the police came.

Pet., Ex. A at 49-51 (verbatim transcription).  Petitioner, represented by counsel, did not object to or take issue with the Deputy District Attorney's account of the crime.  Id. at 52-55.

/////

/////

/////

/////

/////

The panel denied parole, finding that petitioner would pose an unreasonable risk of danger if released:

> The offense was carried out in a very calculated manner, in that when the prisoner and his crime partners saw the victim, they chose to go over and rob him, holding him at gunpoint. The motive for the crime was out of proportion in relation to the offense, in that this appeared to be a robbery just to get some money, which ended up costing the victim his life. The murder of the victim did not deter the prisoner from later committing another criminal offense, when the next night he is caught trying to burglarize a vehicle and take a stereo out of the car. . . . The prisoner, it is noted, does not have a history of criminal behavior. He has, although, programmed in a very limited manner since he has been incarcerated and he has not sufficiently participated in beneficial self-help or therapy programs. And it is noted that he's had a 128 write-up since his last hearing. And the total disciplines that he's had since incarceration total five 115s, three of them for noncompliance of grooming standards, one for horseplay and one for working in the canteen. The psychiatric, psychological report, dated 11/14 of '03, by Dr. John T. Rouse needs to be updated. And we're requesting that Dr. Rouse take a look at the police and Probation Officer's report and reconcile that to the statements that have been made by the inmate with regard to his participation and knowledge of what was going on that evening. Parole plans are realistic and are sufficient for if he remains in California. However, there are no parole plans that have been settled if the inmate is returned to Belize, where he has an INS hold on him to be deported. . . .Other information that we considered was the counselor's report that was prepared by J.A. Robinson, who feels that the prisoner would pose a moderate degree of threat if released to the public at this time. The Panel finds that the prisoner's gains are recent and he must demonstrate an ability to maintain gains over an extended period of time. And in view of the prisoner's lack of program participation, there is no indication that the prisoner would behave differently if paroled. Nevertheless, the prisoner should be commended for the fact that he does have his GED, which he received in 1995, has vocational Welding, and has vocational Landscaping training, although it's noted there is no finalized certificate on that. He's been working on the In-grounds Crew with above average work reports and has sporadically attended NA and AA. And he had completed two classes. One is Thinking Skills for Offense Prevention and Anger Management. However, these positive aspects of his behavior do not outweigh the factors of unsuitability.

Pet., Ex. A at 57-60. The panel relied on the same factors, slightly recast, to find that it was not reasonable to expect that parole would be granted in the following three years. Id. at 60-62.

II.  Standards Under The AEDPA

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[2]  Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by

/////

---

[2] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

5

§ 2254(d)). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

/////

6

1   It is appropriate to look to lower federal court decisions to determine what law has

2   been "clearly established" by the Supreme Court and the reasonableness of a particular

3   application of that law.  See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

4   In this case, the last reasoned decision was from the Court of Appeal, which

5   rejected petitioner's claims:

> The petition is denied for failure to show entitlement to the relief requested under *In re Dannenberg* (2005) 34 Cal.4th 1061, 1078-1100, and for failure to provide a complete record. (*People v. Duvall* (1995) 9 Cal.4th 464, 474-475.)

Pet., Ex. O.  However, the last reasoned decision addressing petitioner's claimed violation of his plea bargain was from the Superior Court:

> The Court rejects Petitioner's argument that the Board's denial of parole violated Petitioner's plea agreement made with the District Attorney's office.  Petitioner entered into a plea agreement, to which the Board was not a party, that provided for an *indeterminate* sentence with a minimum of twenty-seven years and a maximum of *life*.  Therefore, Petitioner's argument is without merit.

Pet., Ex. N (emphases in original).

III. Violation Of The Plea Bargain

When a criminal defendant pleads guilty in exchange for certain promised actions, his right to due process of law entitles him to fulfillment of those promises.  Santobello v. New York, 404 U.S. 257, 262 (1971).  In this case, petitioner alleges that his plea of guilty to murder was premised upon a dismissal of the 'special circumstances' allegations so that he "would gain the benefit of parole."  Pet. at 18:19-21.

Petitioner has presented nothing showing that the nature of his guilty plea or that any bargain leading to the plea included a promise that he would be paroled.   The sentencing transcript shows only that the prosecutor moved to dismiss the special circumstance allegation at the conclusion of the proceeding "in view of the plea and the understanding."  Pet., Ex. D at 5.  In addition, in considering petitioner's request to withdraw his guilty plea, the court said that "the

1  People indicated that they would strike the special circumstances which would prevent the life in
2  prison without the possibility of parole or the death penalty" and in sentencing petitioner, the
3  court commented that petitioner "will be on parole . . . upon his release from state prison. . . ." Id.
4  at 3, 5.  None of this reflects a promise that petitioner would be paroled at any time short of the
5  maximum term of life.  The prosecutor's agreement to strike the special circumstance gave
6  petitioner a possibility, not a guarantee, of parole.  Compare Brown v. Poole, 337 F.3d 1155,
7  1160 (9th Cir. 2003) (during plea colloquy, prosecutor said that defendant had a right to release
8  after serving half her term if she was disciplinary-free).

9          Petitioner also argues that the legal effect of dismissing the robbery charges and
10 the special circumstance allegation is that the parole board would be forbidden to use these facts
11 in determining petitioner's suitability for parole and that the prosecutor specifically breached the
12 agreement by relying on the facts during the parole hearing.  Pet. at 19-20.  Petitioner relies on
13 People v. Harvey, 25 Cal.3d 754 (1979), which holds that a sentencing court may not rely on
14 charges dismissed as part of a plea bargain absent a defendant's waiver.  Once again, petitioner
15 has not presented a copy of the plea transcript, so he has not established the exact nature of the
16 promises made as part of his plea agreement.  Compare United States v. Anderson, 970 F.2d 602,
17 608 (9th Cir. 1992), as amended on denial of rehearing, 990 F.2d 1163 (9th Cir. 1993) (factual
18 stipulations as part of plea agreement may prevent government from presenting additional facts
19 to the parole board); see also People v. McElwee, 128 Cal.App.4th 1348, 1353 (2005) (Harvey
20 did not constrain prosecutor from arguing facts of the offense to the parole board).  He has not
21 borne his burden of showing he is entitled to the issuance of the writ.  Silva v. Woodford, 279
22 F.3d 825, 835 (9th Cir. 2002) (petitioner's burden to show he is in custody in violation of the
23 constitution).

24         In his reply to respondent's answer, petitioner suggests that the parties to the plea
25 agreement understood that petitioner would serve a term of imprisonment as established by the
26 matrix of terms for first degree murder. 15 Cal. Code Regs. § 2403 (b).  "A Traverse is not the

8

proper pleading to raise additional grounds for relief." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir.1994).  Moreover, petitioner's claim is not supported by a copy of the actual plea agreement as opposed to the parties' short discussion of it during the sentencing hearing. Petitioner has not borne his burden in this habeas proceeding.

IV. Parole In California

    A. Legal Framework

In Greenholtz v. Nebraska Penal Inmates, 442 U.S. 1, 7, 11 (1979), the United States Supreme Court found that an inmate has "no constitutional or inherent right" to parole, even when a state establishes a system of conditional release from confinement.  The Court recognized, however, that the structure of parole statutes might give rise to a liberty interest in parole that would, in turn, mean an inmate was entitled to certain procedural protections. Id. at 14-15.  In Greenholtz, the Court found that the "mandatory language and the structure of the Nebraska statute at issue" created such a liberty interest. Board of Pardons v. Allen (Allen), 482 U.S. 369, 371 (1987).

In McQuillion v. Duncan, 306 F.3d 895 (9th Cir. 2002), the Ninth Circuit used the Greenholtz-Allen framework to determine whether California statutes created a liberty interest in parole. The critical statute at issue in McQuillion is California Penal Code section 3041, which provides in relevant part:

> (a) In the case of any prisoner sentenced pursuant to any provision of law, other than [the determinate sentencing law], the Board of Prison Terms shall meet with each such inmate during the third year of incarceration for the purposes of reviewing the inmate's file, making recommendations, and documenting activities and conduct pertinent to granting or withholding post-conviction credit. One year prior to the inmate's minimum eligible parole release date a panel consisting of at least two commissioners of the Board of Prison Terms shall again meet with the inmate and shall normally set a parole release date as provided in Section 3041.5.[3] The release date shall be set in a manner that will provide uniform terms for

---

[3] Cal. Penal Code § 3041.5 establishes procedural requirements for Board hearings.

> offenses of similar gravity and magnitude in respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates. The board shall establish criteria for the setting of parole release dates and in doing so shall consider the number of victims of the crime for which the prisoner was sentenced and other factors in mitigation or aggravation of the crime....
>
> (b) The panel or board shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

The Ninth Circuit found that subdivision (b) was like the statutes in both Greenholtz and Allen:

> California's parole scheme gives rise to a cognizable liberty interest in release on parole. The scheme "'creates a presumption that parole release will be granted'" unless the statutorily defined determinations are made.

McQuillion, 306 F.3d at 901-02.  Again in Biggs v. Terhune, 334 F.3d 910, 914 (9th Cir. 2003), the Court of Appeals reiterated its holding that the California parole scheme created a liberty interest in parole, noting that "California Penal Code § 3041(b) controls" the resolution of the question because its "language clearly parallels the language" under consideration in Greenholtz and Allen.  See also In re Rosenkrantz, 29 Cal.4th 616, 654 (2002), cert. denied, 538 U.S. 980 (2003) (discussing § 3041(b), the California Supreme Court noted "parole applicants . . . have an expectation that they will be granted parole unless the Board finds . . . that they are unsuitable in light of the circumstances specified by statute and regulation").  The court considered the issue yet again in Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir. 2006), and once again found that California Penal Code section 3041 gives a life inmate a liberty interest in parole.

Accordingly, to the extent that respondent urges the petition be denied because petitioner does not have a liberty interest in parole, the argument is not well taken.

/////

The existence of a liberty interest means that a decision to deny parole must be supported by some evidence and not be otherwise arbitrary. Superintendent v. Hill, 472 U.S. 445, 457 (1985); Jancsek v. Oregon Board of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987). The test is "not whether some evidence supports the *reasons* . . . for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety." In re Lee, 143 Cal.App.4th 1400, 1408 (2006) (emphasis in original). The evidence must have some indicia of reliability. Biggs, 334 F.3d at 915. The "some evidence" requirement is a "minimally stringent" standard and does not require the court to reweigh the evidence or examine the entire record. Powell v. Gomez, 33 F.3d 39, 40 (9th Cir. 1994); Hill, 472 U.S. at 455-56.

> [The] analysis is framed by the statutes and regulations governing parole suitability determinations . . . . [W]e must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by "some evidence" . . . constituted an unreasonable application of the "some evidence standard" principle articulated in *Hill*.

Irons v. Carey, 505 F.3d 846, 851 (9th Cir. 2007) (internal citations omitted). When considering a parole habeas petition, this court must review the record to determine whether the state court decision was an unreasonable application of the "some evidence" principle. Id.

The paramount concern in determining parole suitability is public safety. In re Dannenberg, 34 Cal.4th at 1080, 1084, 1085, 1086 ("the overriding statutory concern" is for public safety; purpose of the statutes is to "guarantee that the Board has fully addressed the public safety implications" of the release determination). Accordingly,

> when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the decision of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings.

In re Lawrence, ___ Cal. 3d ___, 2008 WL 3863606, at *17 (Cal. Aug. 21, 2008).

/////

The Board's regulations for setting parole release dates are found in Title 15 of the California Code of Regulations. Section 2401 of this title provides:

> A life prisoner shall be considered for parole for the first time at the initial parole consideration hearing scheduled as provided in Section 2268. A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public.
>
> In setting the parole date the panel shall consider the Sentencing Rules for the Superior Courts. The panel shall also consider the criteria and guidelines set forth in this article for determining the suitability for parole and the setting of parole dates, considering the number of victims of the crime for which the prisoner was sentenced and any other circumstances in mitigation or aggravation.
>
> The terms in this article are guidelines only. The suggested terms serve as the starting point for the board's consideration of each case on an individual basis. The board may establish a term above or below the guidelines when warranted and reasons are stated on the record. A prisoner shall not be released before the minimum eligible parole date.

15 Cal. Code Regs. § 2401.

Section 2402 provides:

> (a) General. The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

/////
/////
/////
/////
/////
/////
/////

(b) Information Considered. All relevant, reliable information available to the panel shall be considered in determining suitability for parole. Such information shall include the circumstances of the prisoner's social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

(c) Circumstances Tending to Show Unsuitability. The following circumstances each tend to indicate unsuitability for release. These circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate unsuitability include:

(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence. The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History. The prisoner has a history of unstable or tumultuous relationships with others.

/////

/////

(4) Sadistic Sexual Offenses. The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors. The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior. The prisoner has engaged in serious misconduct in prison or jail.

(d) Circumstances Tending to Show Suitability. The following circumstances each tend to show that the prisoner is suitable for release. The circumstances are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel. Circumstances tending to indicate suitability include:

(1) No Juvenile Record. The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History. The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse. The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime. The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome. At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History. The prisoner lacks any significant history of violent crime.

(7) Age. The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future. The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

/////

/////

> (9) Institutional Behavior. Institutional activities indicate an enhanced ability to function within the law upon release.

15 Cal. Code Regs. § 2402.

### B. Circumstances Of The Offense

Petitioner argues that the Board's continued reliance on the circumstances of his offense violates due process. Pet. at 21-26.

In Biggs, 334 F.3d at 916, the Ninth Circuit suggested that

> [o]ver time. . . should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole.

See also Sass v. California Board of Prison Terms, 461 F.3d at 1129.

However, in Irons v. Carey, the Ninth Circuit observed:

> We note that in all the cases in which we have held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence. . . . All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms.

505 F.3d at 853-54.

In California, an inmate has a minimum eligible parole date (MEPD), which is the earliest date a "life prisoner may legally be released on parole." 15 Cal. Code Regs. § 2000(b)(67). At the time petitioner was sentenced, this date was computed by applying post-sentence good time and work time credits to the minimum term of twenty-five years for first degree murder, plus any additional determinate terms; petitioner received a two year term for use of a firearm. See In re Dayan, 231 Cal.App. 3d 184, 186 (1991). Petitioner's MEPD was April 12, 2001. Pet., Ex. A at 1. He has been denied parole twice; both denials rested in part on the circumstances of the offense. Id., Ex. A at 57 & Ex. I at 51. Irons suggests, however, that

15

relying on the circumstances of the offense to deny parole in 2000 and 2004 did not violate petitioner's due process rights because he had not (and has not yet) served the minimum term of twenty-seven years.

Moreover, even if the reference in Irons is to the MEPD, this court cannot find that the Board's use of the circumstances of the offense on two occasions runs afoul of the admonition in Biggs. Biggs recognized that the Board's reliance on the circumstances of the offense for some period of time "can be initially justified as fulfilling the requirements set forth by state law." Biggs, 334 F.3d at 916. Moreover, the court also suggested that continued reliance on unchanging factors might implicate an inmate's liberty interest in the face "of exemplary behavior and evidence of rehabilitation." Id. In this case, as explained below, the evidence of petitioner's rehabilitation is not such as to render the Board's reliance a second time on the circumstances of his offense a violation of petitioner's rights.

C. Attitude Toward The Crime

California Penal Code section 2402(b) directs the Board to consider, among other things, the inmate's "past and present attitude toward the crime." This allows the Board to consider an inmate's behavior at the time of the crime and during his incarceration. In re Rosenkrantz, 29 Cal.4th at 679; In re McClendon, 113 Cal.App.4th 315, 322 (2003).

In this case, the BPT panel considered petitioner's actions at the time of the offense and at the time of the hearing: The day after the killing, he and his crime partners were found attempting to strip the victim's car; the day of the hearing, petitioner's account of the offense minimized his own role and was different than the account he gave police upon his arrest. Pet., Ex. A at 49-51.[4] A person's rationalization of his offense or his inability to grasp his own

---

[4] Petitioner objects to the court's consideration of the arrest reports, attached as Exhibit 4 to the Answer, because they were not before the panel. The court has not relied on this exhibit, but rather on the district attorney's presentation at the hearing, which summarized what petitioner told police. Although he was represented by counsel at the hearing, as noted above, petitioner did not object to the panel's consideration of the prosecutor's statements.

role in it may suggest that he remains, at some level, a danger.  In re Shaputis, ___ Cal. 3d ___, 2008 WL 3863608, at *11 (Cal. Aug. 21, 2008).  Moreover, petitioner's apparent minimization of his actions suggests he has not been completely rehabilitated.  This court cannot say that the panel's reliance on this factor or the state court's rejection of the petition on this ground was unreasonable.

D.  Programming And Psychological Factors

Petitioner was evaluated in November 2003 by John T. Rouse, Ph.D., who concluded that:

> Mr. Garbutt has no diagnosed psychopathology.  There is no evidence that he had substance abuse prior to his incarceration (sic).  He has never demonstrated or complained of a mental disorder subsequent to his incarceration.  Thus, it is the opinion of this examiner that any considerations that the Board would ponder for Mr. Garbutt's parole should be related to the factors of his parole rather than to any mental health issues.

Pet., Ex. J at 4.  Dr. Rouse also found that:

> As a result of Mr. Garbutt's insight and understanding, his demonstration of the control and management of anger and negative feeling, it is the opinion of this examiner that Mr. Garbutt possesses a low degree of threat to the community if he is released on parole.

Id.

The panel discounted these conclusions, however, and asked that "Dr. Rouse take a look at the police and Probation Officer's report and reconcile that to the statements that have been made by the inmate with regard to his participation and knowledge of what was going on that evening." Pet., Ex. A at 58.  This is a reasonable response to the different accounts of the crime and of petitioner's participation, which were presented to the panel but not to the psychologist, and which might have had an impact on his assessment of dangerousness.

In addition, although the psychologist suggested that petitioner did not need additional programming such as self-help groups, the panel found that petitioner had not adequately participated in self-help and therapy.  Once again, the recommendation about therapy

might have been affected by the psychologist's awareness of the differences in petitioner's accounts of the crime. In light of these differences, the positive psychological evaluation does not necessarily show that the panel's assessment of petitioner's suitability for parole was not supported

### E. Parole Plans

The panel found petitioner to have realistic parole plans for a release to California, but acknowledged the likelihood that, as a result of the INS hold, he would be deported to Belize. The panel believed that his parole plans in Belize were not sufficient. Pet., Ex. A at 58-59.

An inmate subject to deportation need not have "fail safe parole plans in two different countries." In re Andrade, 141 Cal.App.4th 807, 817 (2006). However, parole suitability may be shown by an inmate's realistic parole plans or the development of skills that can be put to use upon release. Cal. Penal Code § 2402(d)(8). Although petitioner did not have detailed plans for life in Belize following his release, he told the panel his extended family would provide him housing. In addition, he has developed skills in welding and landscaping, which could provide him a livelihood upon his release. His lack of more concrete plans does not suggest he would be a danger if released. See also In re DeLuna, 126 Cal.App.4th 585, 597 (2005) (error to deny parole based on vocational skills deemed insufficient if there is no connection between life crime and lack of skills).

### F. Other Factors

As the panel recognized, many factors in petitioner's background favor a finding of suitability: he had no criminal record as an adult or a juvenile, he has maintained stable social relationships, and his disciplinary record in prison has involved no violence. Pet., Ex. A at 19-23. On the overall record, however, the court cannot say that the state courts applied federal law unreasonably in denying petitioner's state petition.

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within ten days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 2, 2008.

_____
U.S. MAGISTRATE JUDGE

2 garb2130.157